UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

BRIAN MITCHELL,

Defendant.

Case No. 26-cr-20244-BRM-EAS

HON. LAURIE J. MICHELSON

## **DEFENDANT'S VERIFIED MEMORANDUM IN AID OF SENTENCING**

Defendant Brian Mitchell ("Mitchell"), by and through his undersigned counsel, respectfully submits this memorandum in aid of sentencing. Mr. Mitchell recognizes the seriousness of his offense, accepts responsibility for his conduct, and understands the resulting harm suffered by the victims. For the reasons stated below, Mr. Mitchell respectfully requests that the Court sentence him to a term of 60 months' probation and restitution of approximately $2,700,000.

## **FACTS**

Mr. Mitchell is before the Court after pleading guilty to one count of Wire Fraud, in violation of 18 U.S.C. § 1343. The offense arose from commodity-futures trading activity occurring between about January 2021 and February 2022.[1]

[1] Mr. Mitchell's Personal Statement, Exhibit A, provides a fuller perspective of the offense from his point of view.



Doc ID: 9f37ef9ccd368cbebbb014c9ebe72966505eb1bf

Mr. Mitchell was approached by Kevin Mack (who is referenced as Mr. Mitchell's associate in the PSR) and the two began to work together in Young Pros Investment Group ("YPIG"), with Mr. Mack as both its registered agent and sole member of the LLC. YPIG solicited and invested third-party investment funds which were held in accounts belonging to Mr. Mack and Mr. Mack's girlfriend. During the course of the venture, Mr. Mack made representations to investors, which Mr. Mitchell was aware of, that their principal would be guaranteed up to one million dollars and that they would receive monthly percentage returns. Mr. Mitchell did not have the funds to cover this guarantee, nor did he dissuade Mr. Mack from publicizing this falsity to investors. The investments ultimately failed, with substantial investments lost by YPIG. Mr. Mitchell traded many of the YPIG funds prior to August 2021, when most of the YPIG funding was lost. Mr. Mack and Mr. Mitchell parted ways shortly thereafter, although YPIG continued unsuccessfully with Mr. Mack until sometime in November. Mr. Mitchell took insufficient steps to prevent the continued operation of YPIG. Mr. Mitchell's subsequent operation of My Nest Egg LLC provided him income to send to YPIG investors, but Mitchell was not permitted under his ban to operate My Nest Egg LLC. He failed to provide that information to those two investors.

Mr. Mitchell reached out to many of the investors who experienced losses and, after getting to know them, he began working to begin to pay back people



Doc ID: 9f37ef9ccd368cbebbb014c9ebe72966505eb1bf

who had lost investments. Mr. Mitchell did pay back several YPIG clients in this manner in early 2022 and he has continued to make payments to investors that lost money with YPIG even through this year.

Mr. Mitchell did not realize any financial gain from this conduct. The PSR attributes a total loss of $2,749,210.60 to the offense. While Mr. Mitchell did not have access to the bank accounts nor did he trade all these funds personally, he does take responsibility for all the losses sustained because his conduct created the conditions where investors were misled and the venture was able to continue. Mr. Mitchell and Mr. Mack are currently co-defendants in this court for the related CFTC action. Mr. Mack is currently uncharged in the criminal matter.

Mr. Mitchell does not minimize the losses sustained or the impact those losses had on the lives of the people affected by his conduct. He has accepted responsibility for the entire loss amount for purposes of restitution, including funds solicited and traded by Mr. Mack during the entire operation of YPIG. The PSR reports that Mr. Mitchell personally solicited seven YPIG investors who invested a total of $69,000. According to Mr. Mitchell, $34,000 was returned through the investment operation itself, and since 2022 he has personally repaid approximately $45,000.00 to damaged investors. He continues to accept responsibility for the substantially greater restitution obligation resulting from the overall offense.



Doc ID: 9f37ef9ccd368cbebbb014c9ebe72966505eb1bf

Mr. Mitchell has remained compliant while on pretrial release. He has reported as directed and has been actively looking for employment since the acceptance of his plea resulted in the loss of his job.

## STATUTORY AND GUIDELINE ANALYSIS

Mr. Mitchell pleaded guilty to Wire Fraud, in violation of 18 U.S.C. §1343, a Class C felony. The offense carries a statutory maximum term of imprisonment of twenty years and a maximum term of supervised release of three years. The Court may impose a term of probation of not less than one nor more than five years. The parties have also agreed to restitution of approximately $2.7 million.

**Guidelines Calculation**

The Revised Presentence Report correctly calculates a base offense level of 7 under U.S.S.G. §2B1.1(a)(1). It adds 16 levels based upon the amount of loss, two levels based upon substantial financial hardship to one or more victims, two levels based upon violation of a prior administrative order, and four levels because the offense involved a violation of commodities law while Mr. Mitchell was acting as a commodity pool operator. After a three-level reduction for acceptance of responsibility, the PSR calculates a total offense level of 28.

Mr. Mitchell has no prior criminal convictions, no pending charges, and no other arrests. His criminal-history score is zero, although the PSR does not classify him as a zero-point offender for the purposes of the associated two point reduction.

This places him in Criminal History Category I. The resulting advisory guideline range in Zone D is 78 - 97 months. PSR paragraph 70 states if the court found that:

> "the defendant did not personally cause substantial financial hardship to any victim, the defendant could receive a two-level adjustment for being a Zero-Point Offender. This would make his Total Offense Level 26 and with a criminal history category I, his guideline imprisonment range would be 63-78 months."

The PSR contemplates that Court may find that Mr. Mitchell did not "personally cause substantial financial hardship" within the meaning of the defendant-based provisions of §4C1.1(a)(6). Although the PSR identifies several victims who suffered substantial financial hardship as a result of the offense, none of those victims was personally solicited by Mr. Mitchell. Additionally, the losses here were cause by market losses, not something directly intended by Mr. Mitchell, such as theft. The Guidelines specifically require that the defendant personally cause the substantial hardship, and that determination is made independently from whether the offense as a whole resulted in substantial financial hardship under §2B1.1. *See* U.S.S.G. §4C1.1(a)(6) & cmt.n.1. Accordingly, the Court could find that the substantial hardships identified in the PSR, while attributable to the offense in the abstract, were not personally caused by Mr. Mitchell and could then apply the two-level reduction under §4C1.1.



Doc ID: 9f37ef9ccd368cbebbb014c9ebe72966505eb1bf

The plea agreement includes a recommendation from the United States for a substantial downward variance (Plea, B2). Specifically, the government has agreed to recommend that Mr. Mitchell's sentence not exceed 36 months below the low end of the guideline range determined by the Court. With the PSR's present calculation of 78 months at the bottom of the range, the government's contemplated variance recommends a sentence as low as 42 months.

The defense respectfully submits that the government's willingness to depart so substantially from the advisory range itself reflects an important reality: the guideline calculation does not, in isolation, determine the sentence that is sufficient but not greater than necessary in this specific case. The defense submits that consideration of Mr. Mitchell as an individual, his history, his complete absence of criminal history, his acceptance of responsibility, his family circumstances, his conduct following the offense, and the purposes of sentencing warrant a greater variance to a sentence of probation.

**SECTION 3553(a) FACTORS**

18 U.S.C. §3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to accomplish the purposes of federal sentencing. The advisory Guidelines are one consideration in that analysis, but the ultimate sentence must be based upon the individual defendant and the particular circumstances of his offense.



Doc ID: 9f37ef9ccd368cbebbb014c9ebe72966505eb1bf

**Circumstances of the Offense and Characteristics of the Defendant**

There is no dispute that this is a serious financial offense. Investors lost substantial sums of money, and four experienced significant financial hardship. These losses were not theft losses, but were losses in the value of their investments in the market, investments that they may not have made but for the misconduct of Mr. Mitchell. Mr. Mitchell does not ask the Court to disregard those consequences.

However, the nature of the offense is only one part of §3553(a)(1). Congress expressly directs the Court to consider "the history and characteristics of the defendant" as well. In Mr. Mitchell's case, those characteristics demonstrate that the conduct before the Court is an extraordinary departure from an otherwise law-abiding life.

Mr. Mitchell is 44 years old and has not before been convicted of any crime. Indeed, the PSR identifies no prior criminal convictions, no other criminal conduct, no pending charges, and no other arrests. His criminal-history score is zero.

Mr. Mitchell was raised in Detroit in a stable and supportive family. As a young man, he participated in the Urban League of Detroit, math competitions, computer coding, school music programs, and church. Music has remained an important part of his life; he continues be involved in his community and also continues to sing, write music, conduct, and direct choirs. He remains close to his father and siblings and maintains substantial family support.

Mr. Mitchell has been married to his wife, Amyre, since 2005. They have known each other since high school and have a nine-year-old son. His wife is an oncology nurse practitioner at the University of Michigan Hospital. Mitchell lives with his wife and son and has been an integral part of the household.

The Court is sentencing not a career offender or an individual with a history of criminal behavior. Mr. Mitchell did not benefit personally from this offense; he received no money from the investors or Mr. Mack related to this conduct. Mr. Mitchell is a 44-year-old husband and father who has reached this Court without a single prior criminal conviction after making some incredibly poor decisions about his business relationship with YPIG and its investors.

Mr. Mitchell's employment history likewise demonstrates an ability to live a productive and lawful life. Most recently, Mr. Mitchell worked full-time for Rivian, where he performed a variety of functions including service support, software development, repair planning, technology support, and service writing. Before that, he worked as a government mortgage underwriter for United Wholesale Mortgage. His employment with Rivian ended after his employer learned of the plea in this case, and he is presently seeking new employment. He has had several job interviews, however potential employers are understandably waiting to see the resolution of this matter before offering him employment. Mr. Mitchell has also begun working on an entrepreneurial endeavor in computer



Doc ID: 9f37ef9ccd368cbebbb014c9ebe72966505eb1bf

programing and design since he has been unemployed, which he intends to use to generate income upon its completion. Mr. Mitchell is a hard worker and is dedicated to earning income so he may return funds to those harmed by YPIG.

In this case, a sentence of probation would not mean that Mr. Mitchell escapes punishment. He has lost the trust of many in his community, he has lost his employment, he has disappointed his wife at a time when she and their son needed his full support. He faces a restitution judgment exceeding $2.7 million, has substantial existing liabilities, and will live for years with the financial and professional consequences of this conviction. The PSR reports a negative net worth of approximately $258,000 and concludes that he presently lacks the ability to pay a fine in addition to his restitution obligation.

**Seriousness of the Offense, Respect for the Law, and Just Punishment**

Mr. Mitchell understands that the seriousness of the offense requires meaningful punishment. The amount of loss is substantial, and the consequences to the victims are real. His request for probation should not be mistaken for an argument that those consequences are insignificant. Even so, a just punishment must remain individualized. The question considered under §3553(a) is not whether Mr. Mitchell should be punished; he unquestionably should. The question is what degree of punishment is sufficient without becoming greater than necessary.



Doc ID: 9f37ef9ccd368cbebbb014c9ebe72966505eb1bf

The advisory range in this case is driven substantially by enhancements arising from the total monetary loss and characteristics of the offense. Those factors properly inform the Court's analysis and must be taken seriously. They do not, however, erase the other characteristics and circumstances of the person being sentenced.

Moreover, the government itself has recognized that a sentence substantially below the advisory range is appropriate, by agreeing to recommend a sentence as much as 36 months below the bottom of that range. The defense submits that the same individualized considerations supporting that recommended variance support a further variance to probation.

Probation would impose significant restrictions upon Mr. Mitchell's liberty. The Probation Department will, no doubt, impose rigorous conditions of supervision, especially employment requirements and continuing oversight designed to ensure payment of restitution.

Probation will also place him in a challenging position as a father. Mr. Mitchell has a son who will be old enough to understand that his father is being monitored. Mr. Mitchell will no longer be able to attend or chaperone his son's activities throughout his education, as he will not be able to pass the required background checks. Someday soon he will have to explain this conviction and his behavior to his son.

Based on these considerations, a five-year term of probation would constitute real punishment while allowing Mr. Mitchell to work, support his family, and begin satisfying the substantial restitution obligation he owes.

**Deterrence and Protection of the Public**

The consequences Mr. Mitchell has already experienced provide substantial specific deterrence. He has lost his employment, his professional reputation has been damaged, he has pleaded guilty to a federal felony, and he faces a restitution obligation exceeding $2.7 million. Those consequences will not disappear at sentencing and are available for everyone to see.

Mr. Mitchell's history provides little reason to believe that incarceration is necessary to protect the public from future crimes. He is 44 years old and has no criminal record. There is no history of violence, substance abuse, repeated criminal convictions, or failure to comply with court supervision. Since being released on bond, he has complied with the Court's requirements. The Probation Department specifically reports that there is no record of noncompliance during his pretrial release. Additionally, his crime will make sure he is never permitted into a position of privilege over other people's money again.

The Court can further protect the public through stringent conditions of probation. Financial disclosure, restrictions on even personal investment-related activity, employment requirements, and continued supervision can directly address

the circumstances that produced this offense without the need for a lengthy prison sentence. Additionally, should he violate the terms of his probation, the Court will not likely be swayed a second time.

**Need for Educational/Vocational Training, Medical Care, or Other Treatment**

There is no indication that imprisonment is necessary to provide Mr. Mitchell with medical, psychological, substance-abuse, educational, or vocational treatment.

The PSR reports that Mr. Mitchell is physically healthy, has no history of mental-health difficulties, has no history of illegal drug use, and does not consume alcohol. Probation did not administer a drug-abuse assessment because of the absence of any substance-abuse history.

Mr. Mitchell also has substantial education, employment experience, and marketable skills. He attended Morgan State University, later graduated from the University of Phoenix, and has worked in technology support, software development, mortgage underwriting, automotive service support, and related positions. Nothing in the record suggests that incarceration is necessary to provide rehabilitation or additional vocational preparation. On the contrary, permitting him to remain in the community would allow him to seek lawful employment and direct his earnings toward supporting his family and paying restitution.

**Kinds of Sentences Available and the Sentencing Range Established**

The Court has statutory authority to impose probation. Because Wire Fraud is a Class C felony, the authorized term of probation is not less than one nor more than five years. The PSR correctly notes that the advisory Guidelines do not recommend probation because the calculated guideline range falls within Zone D.

That guideline provision does not eliminate the Court's authority to vary from the advisory range after consideration of §3553(a). The defense respectfully submits that this is an appropriate case to exercise that authority.

The Guidelines calculate a range of 78 to 97 months, assuming the court does not find that defendant did not personally cause substantial financial hardship to any victim.[2] The government's negotiated sentencing position contemplates a 36-month downward variance from the bottom of that range. The issue before the Court therefore is both whether a variance is justified, and the extent of the variance necessary to arrive at an individualized sentence that is sufficient but not greater than necessary for this defendant.

The defense respectfully submits that a substantial period of probation, subject to appropriately stringent conditions, satisfies that standard.

---

[2] If the court did find that defendant did ***not*** personally cause the substantial financial hardship, the defendant could receive a two-level adjustment for being a Zero-Point Offender. This would make his guideline range 63-78 months.



Doc ID: 9f37ef9ccd368cbebbb014c9ebe72966505eb1bf

**Need to Avoid Unwarranted Sentencing Disparities**

Section 3553(a)(6) requires consideration of unwarranted disparities among defendants with similar records who have been found guilty of similar conduct. That inquiry must account not only for the offense guideline but also for the individual record and circumstances of the defendant. In this case, there are no currently charged co-defendants to consider.

Mr. Mitchell has Criminal History Category I and zero criminal-history points, although probation did not categorize him as a Zero-Point Offender. He has no prior convictions, arrests, pending charges, or identified other criminal conduct. He accepted responsibility and received the full three-level reduction. He has complied with pretrial supervision. Those facts appropriately distinguish him from defendants whose records demonstrate repeated criminal conduct, obstruction, violations while on release, or an inability to comply with supervision. He also has a wife and son to care for, support from his extended family, and close ties to his community that other defendants do not have. He also began paying restitution in this matter four years ago, in mid 2022, before he had any idea that there would be criminal charges relating to his January 2021 – February 2022 behavior. This is also uncommon for defendants.

The PSR's statistical information indicates that incarceration is common among defendants with an offense level of 28 and Criminal History Category I. It

also indicates that probation has been granted to defendants in this position before. We are asking the Court to extend that opportunity to Mr. Mitchell as well.

**Need to Provide Restitution**

Restitution is important and significant in this case. Mr. Mitchell has agreed to pay restitution of at least $2.7 million, and the revised PSR identifies total restitution of $2,749,210.60. A probationary sentence would allow Mr. Mitchell to return to productive employment immediately and begin devoting his earnings to paying the victims their deserved restitution. His employment history demonstrates that he possesses useful skills and the ability to earn legitimate income. A term in prison, by contrast, would substantially limit his ability to make meaningful restitution payments during his confinement and would also make his subsequent reentry to the workplace more challenging, reducing the rate at which victims would be compensated.

Mr. Mitchell understands that restitution will remain a substantial obligation for years. A lengthy period of probation, coupled with strict terms including the restitution payment schedule, would allow the Court and Probation to supervise him while maximizing his ability to compensate the victims as soon as possible.

## CONCLUSION

Mr. Mitchell does not ask the Court to overlook the seriousness of his conduct or the financial harm suffered by the victims. He accepts responsibility for



Doc ID: 9f37ef9ccd368cbebbb014c9ebe72966505eb1bf

that harm in full and understands that his conviction requires punishment.

The sentence imposed, however, must be the punishment necessary for this defendant. Mr. Mitchell comes before the Court at 44 years old with no prior convictions, no arrests, no pending charges, and zero criminal-history points. He accepted responsibility and pleaded guilty. He has complied fully with pretrial supervision. He has a substantial history of lawful employment, a nine-year-old son, and a wife who he supports. He faces the consequences of a federal felony conviction and a restitution obligation exceeding $2.7 million.

The government has itself recognized that the advisory range overstates the sentence necessary in this case by agreeing to a recommendation 36 months below the low end of the guideline range. The defense respectfully submits that the §3553(a) factors warrant a greater variance.

A substantial term of probation along with monitoring can punish Mr. Mitchell, restrict his liberty, protect the public through stringent financial and supervisory conditions, permit him to care for and support his family, and, critically, allow him to work and begin paying restitution to the victims.

Accordingly, after considering all of the factors set forth in 18 U.S.C. §3553(a), Mr. Mitchell respectfully requests that the Court sentence him to a term of probation of 60 months and restitution in the amount of approximately



Doc ID: 9f37ef9ccd368cbebbb014c9ebe72966505eb1bf

$2,700,000. Such a sentence is sufficient, but not greater than necessary, to accomplish the purposes of federal sentencing.

**Verification Pursuant to 28 U.S.C. § 1746**

I, Brian Mitchell, declare under penalty of perjury that the foregoing information in *Defendant's Verified Memorandum in Aid of Sentencing* is true and correct.

Dated: September 30, 2026

BAM

Brian Mitchell

**WHEREFORE**

For the reasons stated and sworn to above, Mr. Mitchell respectfully requests that the Court make a downward variance and sentence him to a term of probation of 60 months and restitution in the amount of approximately $2,700,000.

Dated: September 30, 2026

Respectfully Submitted,

Stuart M. Collis

Stuart M. Collis (P49530)
Attorney for Defendant
Collis, Griffor & Hendra, PC
1851 Washtenaw
Ypsilanti, MI 48197
(734) 827-1337

# Exhibit A

## Brian Mitchell, Personal Statement

**Judge Michelson,**

I am writing because I want the Court to have an accurate picture of who I am as a person, the life I have lived, my actual role in the events that brought me before you, and what I have learned from this experience.

## Personal Background, Education, and Career

I was born and raised in Detroit. My parents worked hard and made sacrifices to give my siblings and me a strong education and opportunities to succeed. I attended St. John Bosco and later Renaissance High School, where academics, music, leadership, and community involvement became a major part of my life.

Some of the experiences and accomplishments that shaped me include:

- Serving as President of Renaissance Men, Renaissance Singers, and Renaissance Varsity Chorus, along with serving as a Student Teacher for Renaissance Ladies Vocal.
- Participating in the Detroit Urban League, Youth NAACP, Brazeal Dennard Youth Chorale, and DAPCEP (Detroit Area Pre-College Engineering Program).
- Attending Morgan State University on a full-tuition music scholarship, studying music and economics, and performing throughout the United States, Africa, Europe, and Asia. (2000 - 2004)
- Graduating from the University of Phoenix, Ann Arbor Campus, with a degree in Business Management. (2010)
- Working for Detroit Teachers Credit Union, later renamed Michigan First Credit Union, beginning during my senior year of high school in 2000 and returning to work there during the summers between college semesters. This gave me early experience in the financial-services industry before I began my later banking career.
- After returning to Michigan from Morgan State University, I worked for Kay Jewelers and advanced to Assistant Manager. In that role, I was entrusted with keys to the store and access to the safe that secured millions of dollars in jewelry. There was never an incident of theft, missing property, or cash discrepancy while under my watch.
- Building a successful career in banking, lending, and investing with JPMorgan Chase as a licensed Personal Banker, where I was regularly one of the top-performing bankers in the Ann Arbor district and became known to customers and colleagues as "BrianTheBanker." (2006 - 2011)
- Working for KeyBank in Ann Arbor as a Licensed Relationship Manager dealing with investment and lending relationships. (2011 - 2012)
- Holding Series 6 and Series 63 securities licenses and working as a registered representative in the financial-services industry, in addition to holding a life producer license. I held these licenses for 8 years with a clean compliance record.
- Holding a Series 3 license and being registered with the CFTC as a Commodity Trading Advisor (CTA). (2015 - 2017)

- Operating my own financial consulting business, BrianTheBanker and Associates LLC. BrianTheBanker was a membership-based financial services company through which I helped hundreds of people improve their financial lives through lending, investing, retirement planning, credit repair, personal budgeting, and other financial services. (2012 - 2021)
- Working as an FHA Government Mortgage Underwriter at United Wholesale Mortgage, reviewing mortgage loan files under FHA underwriting guidelines and requirements. (2024 - 2025)
- Working for Rivian Automotive in both customer/service support and software development, including work with Rivian's AI team. My responsibilities gave me direct experience working with software, artificial intelligence, technical systems, troubleshooting, and technology-driven product development. That experience has also contributed to the technical knowledge and perspective I am now applying toward developing my own software business. (2025 - 2026)

While attending college, I also became involved with Prepaid Legal Services, now known as LegalShield. That is where I met Kevin Mack Sr. I worked within his organization, and he became a mentor to me in business, sales, and presentation.

One of the phrases commonly used in that environment was "fake it until you make it." The idea was that you sometimes presented yourself as more successful than you actually were in order to project confidence and attract people to your business. I embraced some of that mentality when I was younger. Looking back today, I recognize the danger in that thinking. Exaggerating your financial position or presenting something as true simply because you want others to think highly of you can have consequences far beyond the moment in which the statement is made. I can see the consequences of that thinking clearly in this case.

## Faith, Community, and Service

Faith and community involvement have been consistent parts of my life, beginning long before this case.

- Growing up, Hartford Memorial Baptist Church was an important part of my foundation. I began attending as an infant and was baptized there. Under the leadership of the late Pastor Dr. Charles G. Adams, a prominent and respected figure in the City of Detroit, I was taught strong principles of faith, integrity, character, and service. I became involved in the music ministry at age 12 and served in leadership within that ministry until I left for college at 18.
- As a teenager, I created a neighborhood cleanup program through an HOA in the Victoria Park neighborhood of Detroit to address trash and debris that would accumulate along the perimeter of our gated community. This created paid opportunities for neighborhood youth.
- I currently serve as Treasurer and sit on the Board of Directors of Joyful Treats Community Development Corporation, a nonprofit organization that has been serving our community for approximately a decade. Through Joyful Treats, we provide free food

and groceries to families every other Tuesday and distribute school supplies to children each year before school begins. Over the years, I have mentored interns through the organization who have gone on to college and successful careers.

- I currently attend Perfecting Church in Detroit under the leadership of Bishop Marvin Winans, where I have been a member for 14 years. I have participated in food distributions and other service efforts through the church for the past 12 years and served as a trusted leader in the finance department for 10 years. I was entrusted with church funds, access to the safe, and the safe combination without incident or missing money. I voluntarily stepped away from that responsibility because I believed it was appropriate given the optics surrounding this case. I also served in the music ministry but stepped away because our services are streamed live and I did not want publicity surrounding my case to bring unwanted attention to the ministry.

The people who have surrounded and influenced me throughout my life are an important part of who I am. I grew up around families whose members became doctors, attorneys, judges, police officers, educators, business owners, city officials, and other public servants. Many of those relationships have continued throughout my adult life. My parents were intentional about the environment in which they raised us, and the people closest to me have overwhelmingly been focused on their families, careers, service, and contributing positively to their communities. Criminal activity has never been part of my normal social environment or the world in which I have lived my life.

## My Involvement With YPIG

My relationship with Kevin Mack Jr. developed through the longstanding relationship I had with his father. Kevin Sr. wanted his son to learn investing and trading from me, so Kevin Jr. enrolled in my trading program. He became one of my stronger students and eventually asked me to manage his personal trading account.

While I was managing Kevin's personal trading account, he began making additional deposits. I questioned why he was adding more money because the account was already growing, and I told him that adding more capital would increase risk unnecessarily. He told me that he still wanted to put more of his money to work, so I continued trading the account. I include this because it reflects the mindset and approach I brought into my relationship with Kevin. After nearly two decades working in banking, financial services, investments, and money management, my instinct has always been to think in terms of risk management.

After I began trading Kevin's personal account, he approached me about working with him on Young Pros Investment Group (YPIG), a business he was creating that he named after his existing Young Pros In Real Estate business. With YPIG, my understanding was that my role would be to assist Kevin with trading while he would be responsible for operating the business and overseeing investor communications.

I agreed to work with him subject to a self-imposed limit of one million dollars in total capital. From my experience with futures trading, I considered one million dollars more than sufficient

capital for the type of trading Kevin wanted YPIG to conduct. In my view, taking in additional money beyond that point would only increase the amount at risk without providing a meaningful trading advantage. From the beginning, I understood that the business needed to operate within the applicable regulatory requirements. I encouraged Kevin to pursue the appropriate registration process and even provided him with my study materials.

The statement that later became central to this case came from a private conversation I had with Kevin.

Kevin commented that some people would feel more comfortable investing if there were some type of guarantee. Wanting to impress him, I told him that I had the ability to cover approximately one million dollars in losses. I did not intend for Kevin to share that information with investors. The statement was made privately to Kevin, and it was made because of ego and my desire to appear more financially successful than I actually was.

However, when I later learned that Kevin was representing a guarantee to investors, I did not immediately separate myself. When Kevin told me that the amount solicited had reached approximately one million dollars, I told him to stop the solicitations. He told me that he wanted to continue. I responded the same way I did when I was trading his personal account, telling him that he was putting more money at risk unnecessarily. Kevin responded, “It doesn't matter anyway because we aren't going to lose it.” After some back and forth between Kevin and me, the compromise we reached was that I would continue assisting him only if he stopped representing to investors that their funds were guaranteed. I explicitly told him that I did not want any part of telling people their money was guaranteed when it was not. I told him that if he would not stop, our relationship needed to end. He told me that he would stop, so I continued assisting him with placing trades.

A few months into YPIG, the balance in the trading account had gotten low and Kevin was trying to decide how to proceed because he had withdrawal requests from clients and monthly distributions that were due. He asked how quickly I thought I could grow the money back because he was depending on me to meet certain thresholds. I told him there was no way I could predict that, and that the best thing he could do was pause all withdrawals and distributions, communicate the situation to investors, and allow time for the remaining money to grow.

Kevin told me he did not want to do that because it would raise red flags. He said he had additional money coming in from new solicitations and could use that money to satisfy the next couple of months of withdrawals and distributions while allowing the trading account to grow back. I told him he absolutely could not do that because using new investor money that way would be a Ponzi scheme like Bernie Madoff's and would constitute criminal activity that I would not be involved in. Kevin did not know who Bernie Madoff was, so I explained the case to him.

I then asked whether the statements being sent to investors reflected how low the account balance had become. He told me they did not. At that point, I told him that what he was doing was illegal and that he needed to stop all further solicitations and distributions. Kevin did not

listen to me. I brought his father into a three-way call to discuss the situation, but his father remained neutral and did not tell Kevin to stop. I then reached out to Kevin's girlfriend, Angel, who was handling client communications and sending investor statements, but she did not tell him to stop either.

At that point, Kevin did not send me any additional money to manage because I did not want to be involved in any misuse of investor funds. Since my involvement with investor funds was limited to placing trades in the trading account, and I did not have access to YPIG bank accounts or control over transfers, distributions, or his solicitations, I do not know how Kevin handled those matters after that point.

During my involvement with YPIG, I personally solicited $69,000 from five family members and friends, all of which has since been returned.

I explain these distinctions because I believe accountability requires accuracy, and context matters when understanding my intent.

**What I Take Responsibility For**

I take responsibility for falsely telling Kevin that I had approximately one million dollars available to cover losses when I did not.

I take responsibility for not immediately removing myself once I learned that a guarantee was being represented to investors.

I take responsibility for not reporting what I knew once I became concerned about how the business was being operated.

I also take responsibility for later violating my suspension. This suspension violation came after YPIG closed. I solicited a trading account for the purpose of creating income for myself and using my own income to send money to YPIG investors. However, I understand I was suspended at the time and should not have been soliciting or trading at all.

## The Investors and Restitution

After YPIG ended, I began speaking directly with many of the investors. Those conversations changed the way I looked at the losses.

These were no longer simply numbers on a page. I met people and heard what the money represented in their lives. I learned that some had invested retirement savings or had taken significant financial risks involving their homes, and I became emotionally invested.

As someone who took pride in improving the financial lives of hundreds of clients over the course of my career, those stories were extremely difficult for me to hear and shifted me into a mindset of wanting to personally fix what happened. I organized a recovery plan based on the

financial needs of the investors and made efforts through trading to grow funds back. Those efforts were partly successful, as I was able to send money to a handful of people.

I do not view restitution as simply making the minimum required payment each month for years and eventually considering the matter behind me. The people involved suffered real financial losses, and I want to do everything reasonably possible to help make them whole. In addition to continuing to look for work, I am currently developing a software business and working toward building greater long-term earning capacity. I intend to use my abilities, experience, and future income to contribute meaningfully toward restitution.

## What I Have Learned and Moving Forward

One of the clearest lessons I have learned is the danger of the “fake it until you make it” mentality that I carried with me from much earlier in my life. A statement made to impress someone can have disastrous consequences.

I have learned how important it is to protect myself and others by making sure my intentions, business relationships, responsibilities, communications, and compliance obligations are clearly documented.

I have also learned that anything I attach my name to requires me to understand more than just my own role. I need to know that the entire operation is compliant, that responsibilities are clearly defined, and that what is being communicated to others accurately reflects reality.

Throughout most of my adult life, I have worked to be a trusted and contributing member of my community. I have helped hundreds of individuals improve their financial lives, given countless hours of my time to community service and involvement, and donated tens of thousands of dollars to support people and organizations in my community. The events surrounding YPIG stand in sharp contrast to that broader history of service, trust, and responsibility, and I do not want those events to define the life I have lived or the person I will continue to be.

Going forward, I plan to continue working, supporting my family, serving my community, and building legitimate businesses, but doing so in full compliance.

I respectfully ask the Court to consider the totality of my life, my actual conduct and intent, the pattern of trust and responsibility that has characterized much of my adult life, and the person I intend to continue being when determining my sentence.

Thank you for taking the time to read my statement.

**Respectfully,**

**Brian A. Mitchell**

Dropbox Sign

Audit trail

| | |
|---|---|
| **Title** | Mitchell.Sentencing.Memo.pdf |
| **File name** | Mitchell.Sentencing.Memo.pdf |
| **Document ID** | 9f37ef9ccd368cbebbb014c9ebe72966505eb1bf |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ⚬ Signed |

**This document was requested from app.clio.com**

## Document History

| | | |
|---|---|---|
| SENT | **09 / 28 / 2026**<br>21:26:40 UTC-4 | Sent for signature to Brian Alan Mitchell (brian8mitchell@gmail.com) by services@clio.com acting on behalf of bgriffor@collisandgriffor.com<br>IP: 76.112.76.225 |
| VIEWED | **09 / 28 / 2026**<br>21:27:02 UTC-4 | Viewed by Brian Alan Mitchell (brian8mitchell@gmail.com)<br>IP: 68.49.30.182 |
| SIGNED | **09 / 28 / 2026**<br>21:29:07 UTC-4 | Signed by Brian Alan Mitchell (brian8mitchell@gmail.com)<br>IP: 68.49.30.182 |
| COMPLETED | **09 / 28 / 2026**<br>21:29:07 UTC-4 | The document has been completed. |